# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE DELISSA A. RIDGWAY

| | |
|---|---|
| FORMER EMPLOYEES OF INTERNATIONAL BUSINESS MACHINES CORPORATION )<br><br>Plaintiffs, )<br><br>v )<br><br>UNITED STATES SECRETARY OF LABOR, )<br><br>Defendant ) | **NON-CONFIDENTIAL**<br><br>Court No  04-00079 |

## PLAINTIFF'S RULE 56.1 BRIEF AND COMMENTS CONCERNING THE AUGUST 2, 2004 NEGATIVE DETERMINATION ON RECONSIDERATION ON REMAND

J  Michael Taylor
Christine E  Savage
Douglas S  Ierley
Stephen A  Jones

KING & SPALDING LLP
1700 Pennsylvania Avenue, N W
Washington, D C  20006-4706
Tel      (202) 737-0500
Fax      (202) 626-3737

Counsel for the Former Employees of
International Business Machines Corp

September 21, 2004

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . iii

TABLE OF APPENDICES . . . . . . vi

STATEMENT PURSUANT TO RULE 56 1(c)    1

I.    THE ADMINISTRATIVE DETERMINATION UNDER REVIEW    1

II.    THE ISSUES PRESENTED FOR REVIEW AND THE REASONS FOR
CONTESTING THE DEPARTMENT OF LABOR'S DETERMINATION    2

   A    Whether Labor's Failure To Adequately Investigate Provides The Court
With Good Cause To Reverse . . . . . 2

   B    Whether Labor's Negative Determination Regarding Eligibility Of The
Former Employees To Receive TAA Certification Is Supported By
Substantial Evidence And Is In Accordance With Law . . . 3

   C    Whether Labor's Disregard For Its Statutory Obligations And Its Repeated
Refusal To Conduct A Full Investigation Require Reversal . . . . 4

STATEMENT OF THE FACTS . . . . 4

ARGUMENT . . . . . . . .. 13

I    STANDARD OF REVIEW . . .. 13

   A.    Labor's Denial Of TAA Certification Must Be Based On Substantial
Evidence Developed Through An Adequate Investigation . . . 13

   B    The Statute Is Remedial And Should Be Interpreted In Favor Of The
Former Employees . . . 14

II    LABOR'S FAILURE TO ADEQUATELY INVESTIGATE PROVIDES THE
COURT WITH GOOD CAUSE TO REVERSE . .. . 16

   A    Labor Failed To Properly Investigate And Failed To Create An Adequate
Record Upon Which Its Determination Was Based . . . 16

     1    Labor refused to investigate and evaluate evidence regarding the
key issue of "control" . . . . 16

     2    The Former Employees worked at a shared facility with co-located
BP workers . . . . . . . . 22

   B    Labor Structured Its Investigation On Remand To Reach A Pre-
Determined Outcome . . 24

C       Labor's Lack Of Transparency Has Denied Plaintiffs The Opportunity To
        Meaningfully Participate In This Proceeding    .       .       .       . 26

III.    LABOR'S NEGATIVE DETERMINATION REGARDING ELIGIBILITY OF
        THE FORMER EMPLOYEES TO RECEIVE TAA CERTIFICATION IS
        NEITHER SUPPORTED BY SUBSTANTIAL EVIDENCE NOR IN
        ACCORDANCE WITH LAW             .       .       .       28

        A       BP Controlled The Former Employees    .               30

        B       The Former Employees Supported the Production Of Crude Oil And
                Natural Gas                     .       .       .       . 32

        C.      The Former Employees Meet The Requirements of 19 U S C § 2272(a)    34

                1.      A Controlled Subdivision of BP Has Become Totally Or Partially
                        Separated (§2272(a)(1))                 .    .    .    . 34

                2       There Has Been An Absolute Decrease In BP's U.S  Production
                        (§2272(a)(2)(A))        .       ..    .. 34

                3       There Has Been A Shift In BP Production From The United States
                        To Other Countries (§2272(a)(2)(B))    .    .    . 36

IV      LABOR'S DISREGARD FOR ITS STATUTORY OBLIGATIONS AND ITS
        REPEATED REFUSAL TO CONDUCT A FULL INVESTIGATION REQUIRE
        REVERSAL                        .               .       . 38

CONCLUSION. .                   .       .   .   .   . . 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

Abbott v  Donovan,
7 CIT 323, 588 F. Supp  1438 (1984)                    15, 21

Abbott v  Donovan,
6 CIT 92, 570 F  Supp  41 (1983)                       14

Ammex, Inc  v  United States,
Slip Op  04-89, 2004 WL 1630514 (Ct  Int'l Trade July 20, 2004)    . 39

Ceramica Regiomontana, S A  v  United States,
10 CIT 399, 636 F  Supp  961 (1986),
aff'd, 810 F 2d 1137 (Fed  Cir. 1987)                  14

Former Employees of Ameriphone, Inc  v  United States,  .    36, 38
27 CIT ____, 288 F  Supp  2d 1353 (2003)

Former Employees of Chevron Prods  Co  v  United States Sec'y of Labor,
27 CIT ____, 298 F  Supp  2d 1338 (2003)               14, 39

Former Employees of Chevron Prods  Co  v  United States Sec'y of Labor,
26 CIT ____, 245 F  Supp  2d 1312 (2002)               14, 15, 39

Former Employees of General Electric Corp  v  United States Dep't of Labor, 14
CIT 608 (1990)                                         15

Former Employees of Hawkins Oil and Gas, Inc  v  United States Sec'y of Labor,
17 CIT 126, 814 F  Supp  1111 (1993)                   14, 16, 39

Former Employees of Pittsburgh Logistics Sys , Inc  v  United States Sec'y of
Labor, 27 CIT ____, Slip Op  03-111 (Aug  28, 2003)    . passim

Former Employees of Pittsburgh Logistics Sys , Inc  v  United States Sec'y of
Labor, 27 CIT ____, Slip Op  03-21 (Feb  28, 2003)     15, 15, 17, 30

Former Employees of State Mfg  Co  v  United States,
17 CIT 1144, 835 F  Supp  642 (1993)                   15

PPG Industrial Investment v  United States,
11 CIT 303, 660 F  Supp  965 (1987)                    . 39

Pauling v  Reich,
20 CIT 358, 930 F  Supp  618 (1996) .                  14

Slater Steels Corp. v. United States,
    27 CIT ____, 279 F. Supp. 2d 1370 (2003) . . . . . . . 26

Stidham v. United States Dep't of Labor,
    11 CIT 548, 669 F. Supp. 432 (1987) . . . . . . . . . . 15, 38

United Elec., Radio, and Mach. Workers of America v. Martin,
    15 CIT 299 (1991) . . . . . . . . . . . 39

Universal Camera Corp. v. NLRB,
    340 U.S. 474, 71 S. Ct. 456 (1951) . . . . . . . 28

Woodrum v. Donovan,
    5 CIT 191, 564 F. Supp. 826 (1983),
    aff'd, 737 F.2d 1575 (Fed. Cir. 1984) . . . . . . 15

**FEDERAL STATUTES AND LEGISLATIVE HISTORY**

19 U.S.C. § 2102(4) . . . . . . . . . . . . 14, 30

19 U.S.C. § 2271(a) . . . . . . . . . . . . . 2

19 U.S.C. § 2272. . . . . . . . . 27

19 U.S.C. § 2272(a) . . . . . . . . . passim

19 U.S.C. § 2272(a)(1) . . . . . . . 34

19 U.S.C. § 2272(a)(2) . . . . . . . . 34

19 U.S.C. § 2272(a)(2)(A) . . . . . . 34

19 U.S.C. § 2272(a)(2)(B) . . . . . . . . 36, 37

19 U.S.C. § 2272(c)(2)(B) . . . . . . . . . 35

19 U.S.C. § 2395 . . . . . . . 13

19 U.S.C. § 2395(c) . . . . . . . . . . . 39

Pub. L. No. 107-210 §151, 116 Stat. 933 (Aug. 6, 2002) . . . . . 17

S. Rep. No. 71, 100th Cong., 1st Sess. 11 (1987) . . . . . . . 15

**AGENCY REGULATIONS AND DETERMINATIONS**

29 C F R. § 90 2 . . . . . . . . . 17

29 C F R  § 90 12 . . . . . . 16, 21

29 C F R  § 90 14. . . 16, 21

29 C F R  § 90 16(b) . 34

29 C F R  § 90 18 . . . . . . . . 8

Investigations Regarding Certifications of Eligibility to Apply for Worker
    Adjustment Assistance, 68 Fed  Reg  74973 (2003). . . . . . . . 7

Notice of Determinations Regarding Eligibility To Apply For Worker Adjustment
    Assistance, 68 Fed  Reg  2622 (2004) . 1

**TABLE OF APPENDICES**

Appendix 1          Initial Administrative Record, Inv No TA-W-53,648

Appendix 2          Supplemental Administrative Record, Inv. No TA-W-53,648

Appendix 3          <u>Former Employees of Pittsburgh Logistics Sys , Inc  v  United States</u>
                    <u>Sec'y of Labor</u>, 27 CIT __, Slip Op. 03-21 (Feb  28, 2003)

Appendix 4          <u>Former Employees of Pittsburgh Logistics Sys , Inc  v  United States</u>
                    <u>Sec'y of Labor</u>, 27 CIT __, Slip Op  03-111 (Aug  28, 2003)

Appendix 5          Letter to U S  Court of International Trade from Ms  Brenda Betts,
                    Feb  11, 2004

Appendix 6          Letter to Ms  Brenda Betts from Clerk of U S  Court of International
                    Trade, Feb  19, 2004

Appendix 7          U S  Dep't of Labor's Motion for Voluntary Remand and Relief from
                    Filing the Administrative Record

Appendix 8          Remand Order Issued by U S  Court of International Trade,
                    March 30, 2004

Appendix 9          Letter to U S  Dep't of Labor from U S  Court of International Trade,
                    April 23, 2004

**STATEMENT PURSUANT TO RULE 56.1(c)**

## I.     THE ADMINISTRATIVE DETERMINATION UNDER REVIEW

Pursuant to the Court's order of August 26, 2004, the Former Employees of International

Business Machines Corp. ("Former Employees") timely file these comments concerning the

Notice Of Negative Determination On Reconsideration On Remand (August 2, 2004) ("Labor's

Second Negative Remand Determination") (**S.P.R. 263-269**) in administrative case number TA-

W-53,648, as assigned by the U S  Department of Labor ("Labor") [1]  Because the Former

Employees have not had an opportunity to brief any dispositive issues before the Court in this

case,[2] the Former Employees treat these comments as their brief in support of the Rule 56 1

motion for judgment on the agency record, which is filed contemporaneously with this brief

Accordingly, the administrative determinations under review include

- Notice Of Negative Determination Regarding Eligibility To Apply For Worker
  Adjustment Assistance, International Business Machines Corp , Tulsa, Oklahoma,
  TA-W-53,648 (Dec  2, 2003) ("Labor's Initial Negative Determination") (**P.R.
  23-24**) [3]

---

[1] The initial administrative record and the supplemental administrative record are
attached respectively, as **Appendix 1** and **Appendix 2**  The administrative record, with
corresponding page numbers, is referenced in this Brief as follows.  "**P.R.**" denotes the public
version of the initial administrative record, "**C.R.**" denotes the confidential version of the initial
administrative record, "**S.P.R.**" denotes the public version of the supplemental administrative
record, and "**S.C.R.**" denotes the confidential version of the supplemental administrative record

[2] As set forth in the statement of the facts, Labor has twice sought a voluntarily remand of
this matter prior to Rule 56 Briefing   After issuance of the Second Negative Remand
Determination, counsel for the Former Employees and counsel for Labor discussed the matter
and agreed that complying with Rule 56 briefing requirements while commenting on the Second
Negative Remand Determination would promote judicial efficiency   After the filing of a consent
motion, on August 26, 2004, the Court issued its Order Granting Leave To File Reply Comments
And Amended Scheduling Order

[3] The results of Labor's Initial Negative Determination were published in The Notice of
Determinations Regarding Eligibility To Apply For Worker Adjustment Assistance, 68 Fed  Reg
2622 (Jan  16, 2004) ("The workers {sic} firm does not produce an article as required for
certification under Section 222 of the Trade Act of 1974 ") (**P.R. 29-31**)

- Notice Of Negative Determination Regarding Application For Reconsideration For Former Employees Of International Business Machines Corp , Tulsa Oklahoma, To Apply For Adjustment Assistance Under Provisions Of The Trade Act Of 1974 (March 31, 2004) ("Labor's First Negative Remand Determination") (**P.R. 55-58**)

- Labor's Second Negative Remand Determination (**S.P.R. 263-269**)

Labor issued these determinations in response to the Former Employees' petition for Trade

Adjustment Assistance ("TAA") under Section 221(a) of the Trade Act of 1974, as amended

See 19 U S C. § 2271(a))  (**P.R. 2**)

## II.    THE ISSUES PRESENTED FOR REVIEW AND THE REASONS FOR CONTESTING THE DEPARTMENT OF LABOR'S DETERMINATION

### A.    Whether Labor's Failure To Adequately Investigate Provides The Court With Good Cause To Reverse

As discussed below, the Former Employees were outsourced from the British Petroleum

Company p l.c  ("BP") to PricewaterhouseCoopers ("PwC") and then to IBM  Even so, the

Former Employees at all times remained under the control of BP until ultimately being

terminated as a result of surging imports and BP's shift from U S  to foreign production  In fact,

Labor certified as TAA-eligible the co-workers of the Former Employees who were terminated

just before the Former Employees, themselves, were outsourced  After being outsourced, the

only thing that changed for the Former Employees was the entity signing their paychecks, the

Former Employees continued working at the direction of and for the benefit of BP in the

production of oil and natural gas  Thus, the Former Employees qualify for trade adjustment

assistance as workers engaged in the production of oil and natural gas

After Labor's second remand request was granted, the Former Employees made very

clear to Labor's investigator that "control" was the key issue in this case  Even so, Labor refused

to investigate the issue of control and ignored record evidence  Importantly, Labor reached a

pre-determined decision apparently based on a policy rationale that, rather than being

- 2 -

transparent, even today remains "confidential." The administrative record clearly documents

Labor's last minute efforts to gather evidence supporting its pre-determined result.

Moreover, on July 28, 2004, Labor asked counsel for the Former Employees to consent to

a three-week extension because Labor needed to obtain information from BP that was necessary

to fully evaluate the Former Employees' claims. The Former Employees consented.

Surprisingly, Labor filed its Second Negative Remand Determination a mere three business days

after requesting an additional three weeks. Labor placed no additional evidence from BP on the

record. Instead, the only new record evidence was that discussed above, which Labor hastily

gathered in an attempt to justify its pre-determined result.

Even though Labor had a duty to fully investigate whether the Former Employees were

eligible for TAA benefits, Labor pressed forward with filing a pre-determined outcome. Labor

failed to act with the utmost regard for the workers, as required by law, when after two remands

it continued to refuse to investigate whether the Former Employees were controlled for purposes

of the Trade Act of 1974, as amended.

**B.     Whether Labor's Negative Determination Regarding Eligibility Of The
         Former Employees To Receive TAA Certification Is Supported By
         Substantial Evidence And Is In Accordance With Law**

Labor's determination that the Former Employees were not entitled to trade adjustment

assistance is not supported by substantial evidence on the record and is not in accordance with

law. By resting its decision on whether BP and IBM were affiliated, rather than whether BP

controlled the Former Employees, Labor failed to apply the proper legal analysis. Similarly,

Labor mischaracterized the claims of the Former Employees to avoid evaluating whether the

Former Employees supported the production of a trade impacted article. Labor also refused to

apply the existing record evidence to the legal standard required by 19 U.S.C. § 2272(a).

Labor based its <u>Second Negative Remand Determination</u> on mere assumptions that were never investigated, and Labor simply ignored un-contradicted record evidence. Had Labor applied the statutory standard to the actual record evidence, Labor would have determined that certification was required in this instance

### C. Whether Labor's Disregard For Its Statutory Obligations And Its Repeated Refusal To Conduct A Full Investigation Require Reversal

Labor has sought two voluntary remands of this matter, and in each instance it (1) refused to apply the correct legal standard concerning certification for trade adjustment assistance and (2) failed to conduct a full investigation that marshaled all relevant facts  Instead, Labor has demonstrated an unwavering commitment to a results-oriented approach in this case  The Former Employees acknowledge that reversal with instructions for Labor to certify the Former Employees is an extraordinary remedy  Case law makes clear, however, that such a remedy is the only alternative in situations like this, where repeated remands (during which Labor refuses to fulfill its statutory obligations concerning its investigation in favor of promoting a predetermined outcome) have delayed benefits to real people whom Congress intended to be accorded immediate and timely relief under the statute

### STATEMENT OF THE FACTS

Approximately 300 former employees of IBM are directly affected by Labor's denial of the subject petition for TAA eligibility (**P.R. 1**)  The Former Employees worked under the control of BP at a Tulsa, Oklahoma accounting facility ("Tulsa facility") until they lost their jobs as a result of increasing imports of oil and gas into the United States and BP's shifting of its U.S production of oil and gas overseas  (**S.P.R. 127-30**), (**S.P.R. 141**) (Betts' Declaration ¶ 14), (**S.P.R. 147**) (Mouser's Declaration ¶ 14)  The claims of the Former Employees again are before the Court following Labor's Second requested remand

### A.    Former Employees' Employment History

The Former Employees worked for Amoco Corporation ("Amoco") until Amoco merged with BP in 1998. After the merger, the Former Employees became employees of the combined corporate entity known as BP Amoco Group, which has since changed names and is now known as BP **(S.P.R. 119-120)** BP is engaged in the exploration, drilling, and production of oil and natural gas in the United States **(S.P.R. 189-90)**, **(S.P.R. 139)** (Betts' Declaration at ¶ 5) BP both owned and operated U S oil and gas wells. the production activities of which were managed by the Former Employees in Tulsa **(S.P.R. 138-39)** (Betts' Declaration ¶¶ 3, 5), **(S.P.R. 144-45)** (Mouser's Declaration ¶¶ 3, 5) Specifically, BP was known as the "working interest owner" for many of these wells, because BP held the largest ownership share As the actual operator of these self-owned wells, and as the operator of other leased wells, BP was responsible for extraction, production, and delivery of the oil and natural gas **(S.P.R. 139)** (Betts' Declaration ¶ 5), **(S.P.R. 145)** (Mouser's Declaration ¶ 5)

Individually, the Former Employees performed functions that were necessary and integral to BP's exploration, drilling, and production As explained by Brenda Betts and Julia Mouser (two of the Former Employees) in Declarations submitted for the administrative record during Labor's remand proceeding

> The IBM Tulsa facility provided production management and accounting for BP's North American production, exploration, and drilling operations Examples of jobs performed by the Former Employees included managing oil and gas production and related leases, managing BP's production-related assets and equipment, accounting for various production plants, supporting division order operations, performing procurement functions, and submitting regulatory government reports on North American production .

**(S.P.R. 138)** (Betts' Declaration ¶ 3), **(S.P.R. 144)** (Mouser's Declaration ¶ 3).

**Business Confidential Information Deleted**

After the merger of Amoco and BP, the work force at the Tulsa facility was reduced

**(P.R. 51-54)**   In 1999, workers performing the same functions who had been terminated from

the Tulsa facility were certified by Labor for trade adjustment assistance benefits **(P.R. 57)**

Labor concedes that when it previously certified the Tulsa facility for TAA, it determined that

personnel performing accounting work for the BP Amoco Group were "engaged in activities

related to exploration and production of crude oil and natural gas " **(P.R. 57)**

In early 2000, BP decided to outsource the employees who continued to work in crude oil

and natural gas production at the Tulsa facility to PricewaterhouseCoopers ("PwC") **(P.R. 43-**

**44)**.  Thus, the BP employees remaining at the Tulsa facility after the terminations during 1998-

99 became employees of PwC.  Just over two years later, in October 2002, PwC's consulting

division was acquired by IBM   **(S.P.R. 139)** (Betts' Declaration ¶ 8), **(S.P.R. 146)** (Mouser's

Declaration ¶ 8), **(S.C.R. 199)**

Although the Former Employees were outsourced from BP to PwC, then IBM, the daily

activities of the Former Employees remained under the control of BP   That is, the Former

Employees continued working to maintain and manage BP's exploration, drilling, and

production activities pursuant to a Service Level Agreement ("SLA")—which was the

outsourcing contract that BP entered into with PwC, and then IBM **(S.C.R. 18-30; S.P.R. 119)**

This SLA dictated the scope of the work to be performed by the Former Employees   The SLA

also established the performance standards against which the Former Employees' job

performances were assessed **(S.C.R. 18-30; S.P.R. 124-25)**   In fact, when BP first outsourced

the Former Employees to PwC, [

Business Confidential
Information Deleted

] **(S.C.R. 29)**

The [                              ] also stated, "[

]" **(S.C.R. 29)**   As detailed in the section II of

this brief, the record contains significant other indicia of BP's control over the employment of

the Former Employees at the Tulsa facility  **(S.C.R. 8-9; S.P.R. 124-125)**   Consequently, the

jobs of the Former Employees did not change even though the name on their paycheck was

different   The Former Employees even continued to receive the same salaries  **(S.P.R. 139)**,

(Betts' Declaration ¶7); **(S.P.R. 145)** (Mouser's Declaration ¶7)

The Former Employees were discharged after consultations between BP and IBM led to

the decision that additional cost saving measures be taken with regard to the production functions

performed at the Tulsa facility  **(S.P.R. 141)** (Betts' Declaration ¶ 14), **(S.P.R. 147)** (Mouser's

Declaration ¶ 14)   Following the initial round of terminations in November 2003, the Former

Employees petitioned for TAA certification on November 19, 2003  **(P.R. 2)**

**B.    Labor's Original Investigation Of The Former Employees' Petition For TAA
         Certification**

Labor instituted an investigation of the Former Employees' eligibility for TAA on

November 26, 2003   See Investigations Regarding Certifications of Eligibility to Apply for

Worker Adjustment Assistance, 68 Fed  Reg  74,973, 74,974 (Dec. 29, 2003)  **(P.R. 21)**   On

December 2, 2003, a mere six days after it initiated its investigation, Labor determined that the

Former Employees did not qualify for TAA benefits because they did not produce an article

under Section 222 of the Trade Act of 1974   Labor's Initial Negative Determination **(P.R. 23)**.

In reaching this determination, Labor apparently ignored the outsourcing relationship between

BP and IBM.

## C.    Labor's First Remand Proceeding

On February 6, 2004, Ms Brenda Betts, on behalf of the Former Employees, filed an application for Administrative Reconsideration of the Negative Determination ("Application for Administrative Reconsideration") with Labor pursuant to 29 C F R § 90 18   (**P.R. 32**)   Unsure of the procedure to be followed for securing an administrative review, on February 11, 2004, Ms Betts also submitted a letter to the Court seeking judicial review of <u>Labor's Initial Negative Determination</u> (**App. 5**)   On February 19, 2004, the Clerk of the Court sent a letter to Ms Betts acknowledging that her correspondence had been accepted as sufficient to initiate a civil action appealing the <u>Negative Determination</u> (**App. 6**)   On March 23, 2004, Labor moved that the matter be remanded so that Labor could "complete its further investigation " <u>Defendant's Motion for Voluntary Remand and Relief from Filing the Administrative Record</u>, at 2 (**App. 7**) The Court agreed and ordered a remand on March 30, 2004 (**App. 8**)

In her letter requesting reconsideration of <u>Labor's Initial Negative Determination</u>, Ms Betts—on behalf of the Former Employees—supplemented the administrative record to clarify the facts surrounding the Former Employees' jobs and ultimate termination   (**P.R 32**) Specifically, the letter and its attachments demonstrated

- The Former Employees "perform{ed} work for British Petroleum " (**P.R. 32**)

- The Former Employees were "outsourced" in October 1999 following the merger of Amoco and BP   (**P.R. 43-44**)   This was the result of an "outsourcing strategy " (**P.R. 43**).

- BP was shifting oil production to Russia and acquiring Iraqi oil when the Former Employees ultimately were terminated from their jobs in 2003   (**P.R. 32, 36, and 39**)

- BP approved IBM's termination of the Former Employees working out of the Tulsa facility   (**P.R. 32**)

- Amoco/BP employees performing the same jobs and working in the same facility as the Former Employees were certified to receive trade adjustment assistance in 1999   **(P.R. 32)**

During the remand proceeding, Labor interviewed Ms Betts by telephone on March 15, 2004   **(P.R. 50)**   She stated that the employees in the Tulsa facility were paid by BP Amoco prior to 1999 and that the workers in Tulsa have been performing the same work from 1960 to date.  Id   This information was confirmed by a Labor investigator in another telephone interview of Ms Betts on April 12, 2004 [4]  Id   Labor also contacted Mr Tom Laskowski from IBM on March 15, 2004, who stated that "BP is a client/customer of IBM" but that there was no corporate affiliation between IBM and BP Amoco   Id

On March 31, 2004, the Department issued the results of its remand proceeding, again denying the Former Employees' application for TAA benefits   See Labor's First Negative Remand Determination **(P.R. 55)**   Labor recognized that the Former Employees stated in their application that they worked at a "British Petroleum Accounting Center operated by IBM which was certified eligible for TAA in 1999 "  **(P.R. 56)**   Labor also recognized that a "company official" stated that "there is no affiliation between the subject facility and British Petroleum" and that "IBM provides accounting services to BP at many locations in the U S and abroad out of its own facility in Tulsa, Oklahoma "  **(P.R. 56)**   Labor concluded

> Before service workers can be considered eligible for TAA, they must be in direct support of an affiliated facility currently certified for TAA or employed on a contractual basis at a location currently certified for TAA   This is not the case for the workers at International Business Machines Corporation, Tulsa, Oklahoma

**(P.R. 56)**.

---

[4]   The memorandum documenting Labor's second interview of Ms Betts was dated April 12, 2004, which is after Labor's First Negative Remand Determination (March 31, 2004)

Thus, Labor again appeared to ignore the record evidence of BP's continuing "control" over the work of the Former Employees at the Tulsa facility, rather, it appeared to have based its analysis entirely on the corporate ownership of the subdivision working at the Tulsa facility   In addition, Labor appeared to state that service workers can only be certified if supporting, either directly or on a contractual basis, a facility *currently* certified for TAA, (**P.R. 56**) (emphasis added), which was inconsistent with previous determinations Labor made with respect to the eligibility of service workers for TAA benefits

Recognizing this inconsistency in Labor's policy, on April 23, 2004, the Court sent a letter to Labor, asking Labor to clarify the standard it used to determine the eligibility of service workers for TAA   Specifically, the Court found that Labor's denial of the Application for Reconsideration was based, in part, on Labor's determination that the Former Employees were not "*currently certified* for TAA or employed on a contractual basis at a location *currently certified* for TAA* "   Letter from Court, at 1 (April 23, 2004) (**App. 9**)   The Court stated that in other cases, Labor had indicated the standard was whether the facility at which the workers were employed was "certifiable," rather than whether the facility had been "certified "   Id   at 2   As a result of Labor's inconsistency, the Court requested that Labor file a memorandum of law explaining its position on the issue   Id   at 3   The Court stated that if Labor did not previously set forth its rationale with respect to this standard, and if Labor believed that remand was more appropriate than offering a *post hoc* rationale for the standard, it should file a motion for voluntary remand after consulting with Plaintiffs   Id

On May 14, 2004, Labor filed a consent motion for voluntary remand so that it could conduct a further investigation and make a redetermination concerning the Former Employees' eligibility for TAA benefits   See Consent Motion for Voluntary Remand (**S.P.R. 152**)   Labor

- 10 -

explained that it was requesting the remand, in part, because <u>Labor's First Negative Remand Determination</u> "does not reflect Labor's current interpretation of the Trade Act regarding eligibility of service workers for TAA benefits " (**S.P.R. 155-156**)  In addition, Labor stated that because its "initial investigation and the inquiries conducted under the request for reconsideration were limited to finding out if the service workers in question were performing services for a currently certified facility,"  on remand Labor "intend{ed} to supplement the administrative record with additional evidence regarding the relationship between the Tulsa Accounting Center and British Petroleum " (**S.P.R. 156-157**)

D.    **Labor's Second Remand Proceeding**

The Court granted Defendant's motion for voluntary remand on June 1, 2004 (**S.P.R. 136**)  On June 8, 2004, counsel for the Former Employees conferred by telephone with Labor's investigator, Ms. Amy Chen, to discuss Labor's investigation and to clarify what legal and factual information could be submitted for consideration when Labor made its determination on remand  Ms Chen stated that evidence of a contractual relationship between BP and IBM would be helpful for purposes of establishing that BP "controlled" the Former Employees at the Tulsa facility  (**S.P.R. 119**)  As a result of Labor's request, on June 9, 2004, the Former Employees submitted evidence of the SLA between BP and IBM (**S.C.R. 2**) [5]  In addition, on July 6, 2004, the Former Employees submitted evidence demonstrating that while BP had outsourced the

---

[5] The referenced letter only remains on the record as Exhibit 1 of the confidential version of the Letter From King & Spalding LLP To The Department Of Labor (July 6, 2004) (**S.C.R. 16**)  After discussions with Labor about the referenced IBM and PwC documents that were attached to the June 9, 2004 letter, it was agreed that because the letter referred to third-party corporate documents, it should only remain on the record as a stamped "confidential" document (as it was presented in exhibit 1 to King & Spalding LLP's July 6 letter)  See Correspondence Between King & Spalding LLP and Department Of Labor (**S.P.R. 198 & 202**)

Former Employees working at the Tulsa facility to PwC, then IBM, BP retained control over the Former Employees' work-related activities   (**S.C.R. 2-117; S.P.R. 118-197**)

The Former Employees' July 6, 2004 submission also contained information--much of it from BP's own SEC Form 20-F annual reports and publicly available statistics--that demonstrated all the other requirements for certification under 19 U S C § 2272(a) of the Trade Act of 1974 were satisfied (**S.P.R. 125-130 & exhibits**)   Specifically, the Former Employees demonstrated that (1) the Former Employees supported production of a trade impacted article, (2) the Former Employees became totally or partially separated from their jobs, (3) BP's U S production of oil and natural gas decreased absolutely prior to the displacement of the Former Employees, (4) imports of oil and natural gas increased during the relevant period and reached record levels in 2003, and (5) BP shifted U S oil and gas production to foreign countries   Id

During July, counsel for the Former Employees participated in follow-up conference calls with Ms  Amy Chen from Labor about the status of Labor's investigation   Ms  Chen indicated that Labor had verified the existence of the SLA, which went to the issue of BP's control over the employment of the Former Employees at the Tulsa facility and that Labor needed additional information concerning BP's oil and gas imports and its shifting of production overseas, which she requested the Former Employees to provide   In response, the Former Employees filed a submission containing the requested additional, uncontested evidence on this statutory element on July 28, 2004   (**S.P.R. 204-255**)   Notably, this evidence was never discussed in Labor's Second Negative Remand Determination

On July 26, 2004, Ms  Chen contacted counsel for the Former Employees to ask if they would consent to a two-week extension of time for the remand proceeding so that Labor could obtain factual information from BP that was essential to its investigation   Counsel informed

Labor that the Former Employees would not object to such an extension, but that Labor needed to contact the Department of Justice ("DOJ") so that DOJ could submit a motion to the Court for an extension of time for the filing of the remand determination. On Wednesday, July 28, 2004, Ms. Chen again called counsel for the Former Employees and stated that her supervisor requested that she obtain a three-week, rather than a two-week, extension to the remand proceeding because the additional week likely would be needed by Labor to gather and evaluate the information from BP. The Former Employees again consented. Instead of being served with the expected motion for extension of time, however, the Former Employees received the results of Labor's second remand determination. As discussed below, after July 26, 2004 there is no record evidence obtained from BP despite Labor's acknowledgement that such information was needed to complete the investigation.

In its August 2, 2004 second remand determination, Labor once again denied TAA certification to the Former Employees. **(S.P.R. 263)**

## ARGUMENT

## I.    STANDARD OF REVIEW

### A.    Labor's Denial Of TAA Certification Must Be Based On Substantial Evidence Developed Through An Adequate Investigation

In reviewing a denial of TAA certification by Labor, the Court applies the standard of judicial review set forth at 19 U.S.C. § 2395, which states in pertinent part:

> The findings of fact by the Secretary of Labor . . . if supported by substantial evidence, shall be conclusive, but the court, for good cause shown, may remand the case to such Secretary to take further evidence, and such Secretary may thereupon make new or modified findings of fact and may modify his previous action, and shall certify to the court the record of the further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

On appeal, the Court reviews Labor's negative determinations for certification of TAA eligibility "to assure that the Secretary's determination is in accordance with law, and is supported by substantial evidence contained in the administrative record." Abbott v. Donovan, 6 CIT 92, 96, 570 F. Supp. 41, 46 (1983). Substantial evidence "'is something more than a "mere scintilla," and must be enough reasonably to support a conclusion.'" Pauling v. Reich, 20 CIT 358, 359, 930 F. Supp. 618, 619 (1996) (quoting Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987))

No deference is due determinations based on inadequate investigations. If Labor's investigation of TAA claims do not meet a "'threshold requirement of reasonable inquiry, . . . {c}ourts have not hesitated to set aside agency determinations which are the product of perfunctory investigations.'" Former Employees of Chevron Prods. Co. v. United States Sec'y of Labor, 27 CIT __, 298 F. Supp. 2d 1338, 1340 (2003) (quoting Former Employees of Hawkins Oil and Gas, Inc. v. United States Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993)). In this instance, Labor's determination is based on an inadequate investigation, should be given no deference, and should therefore be reversed and remanded with instructions that Labor certify the Former Employees as eligible to receive TAA benefits.

## B.    The Statute Is Remedial And Should Be Interpreted In Favor Of The Former Employees

The Trade Act of 1974 was intended    "to provide adequate procedures to safeguard American industry and labor against unfair or injurious import competition, and to assist industries, firm{s}, workers, and communities to adjust to changes in international trade flows." 19 U.S.C. § 2102(4). Legislative history makes clear that the statute is remedial

> Congress intended to "encourage workers who are unemployed because of import competition to learn the new skills necessary to find productive employment in a changing American economy."

S. Rep. No. 71, 100th Cong., lst Sess. 11 (1987)

The remedial nature of the statute requires that it be construed liberally. See Woodrum v. Donovan, 5 CIT 191, 198, 564 F. Supp. 826, 832 (1983), aff'd, 737 F. 2d 1575 (Fed. Cir. 1984) "{T}he trade adjustment assistance laws are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose." Former Employees of Chevron Prods. Co. v. United States Sec'y of Labor, 26 CIT __, 245 F. Supp. 2d 1312, 1318 (2002) "'{B}ecause of the *ex parte* nature of the certification process, and the remedial purpose of the {trade adjustment assistance} program, the Secretary is obliged to conduct his investigation with the utmost regard for the interests of the petitioning workers.'" Stidham v. United States Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (citing Abbott v. Donovan, 7 CIT 323, 328, 588 F. Supp. 1438, 1442 (1984)) (emphasis added).

Labor may not merely rely on information that supports a predetermined outcome and ignore overwhelming evidence to the contrary. If an issue arises, and here the issue existed on remand as to whether the Former Employees were controlled by BP, a "reasonable inquiry" must be undertaken. See Former Employees of Pittsburgh Logistics Sys., Inc. v. United States Sec'y of Labor, 27 CIT __, Slip Op. 03-21 at 7 (Feb. 28, 2003) (**App. 3**) (hereinafter "Initial PLS Opinion") ("The developed record must evince substantial evidence to confirm or refute relevant issues encountered during the course of the investigation, and if an investigation does not pass a threshold of reasonable inquiry, the record is unsupported by substantial evidence.") (citing Former Employees of State Mfg. Co. v. United States, 17 CIT 1144, 1148, 835 F. Supp. 642, 645 (1993), Former Employees of General Electric Corp. v. United States Dep't of Labor, 14 CIT 608 (1990))

As discussed in greater detail below, the record demonstrates that Labor's investigation in this matter clearly was not conducted with "utmost regard" for the workers. Despite the fact that Labor has an "affirmative duty to investigate," Hawkins Oil and Gas, 814 F. Supp. at 1114 (citations omitted), it failed to do so concerning major issues raised by the Former Employees

## II.    LABOR'S FAILURE TO ADEQUATELY INVESTIGATE PROVIDES THE COURT WITH GOOD CAUSE TO REVERSE

Labor's own regulations require it to conduct an investigation that "marshal{s} all relevant facts to make a determination on the petition." 29 C.F.R. § 90.12. As recognized by the Court, "'{t}o marshal' connotes ordering or mustering activity." Initial PLS Opinion, Slip Op. 03-21 at 7 (**App. 3**) Labor is armed with subpoena power to ensure that full and complete investigations are conducted. See 29 C.F.R. § 90.14. Labor's Second Negative Remand Determination, however, is an example of an "investigation" being conducted in order to reach a pre-determined outcome

Following the second remand, Labor (1) ignored record evidence; (2) affirmatively took steps to reach a pre-determined outcome; and (3) acted in a non-transparent manner, applying an undisclosed legal standard

### A.    Labor Failed To Properly Investigate And Failed To Create An Adequate Record Upon Which Its Determination Was Based

#### 1.    Labor refused to investigate and evaluate evidence regarding the key issue of "control"

The first statutory element of TAA certification[6] requires Labor to examine whether "a significant number or proportion of the workers in such workers' firm, or an *appropriate subdivision* of the firm, have become totally or partially separated." 19 U.S.C. § 2272(a) (emphasis added)    The Department's own regulations recognize that "{t}he term *appropriate*

---

[6] See additional discussion, infra, at Section III A

*subdivision* includes auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities." 29 C F R  § 90 2 (emphasis in regulation)

In a case involving outsourced workers who continued performing their same jobs under the control of their initial employer until ultimately being terminated, the Court recognized

> It is true that "appropriate subdivision" equates to, and is therefore delineated by, the production line of the import-impacted article, but nowhere in the language of the statute is it implied that "appropriate subdivision" must be confined or defined in terms of a single business entity producing the import-impacted article. A product line, or appropriate subdivision where the articles are produced, can encompass more than a single establishment

*Initial PLS Opinion*, Slip Op  03-21 at 10 (**App. 3**) [7]  In reviewing the same case on remand, the Court made absolutely clear that when investigating the claims of trade-impacted outsourced workers, Labor must consider the relationship of the producing company and the outsourced subdivision of workers by evaluating whether the producer controlled the outsourced subdivision

> {A}s already determined by the Court, it is the relationship between LTV and the PLS subdivision that matters for purposes of determining this TAA petition  Previously, in the context of the "service worker" test, Labor had argued that it interpreted "control" only to mean ownership and corporate voting control The Court found such argument at odds with other affirmative TAA benefits decisions and unduly restrictive in light of the remedial purpose of the statute  The Court made clear that Labor was to determine who "exercised actual control" over and who "managed and directed" the plaintiffs for purposes of determining "control," which is a separate consideration from "ownership"

---

[7] The Court was interpreting statutory language that has since been amended  As noted, "{t}he plaintiffs' petition preceded the 90th day following the effective date of the Trade Adjustment Assistance Reform Act of 2002 " *Initial PLS Opinion*, Slip Op  03-21 at n 1 (**App. 3**) (citing Pub. L  No  107-210 §151, 116 Stat  933, 953-54 (Aug  6, 2002))  Importantly, though, the first subsection of 19 U S C  § 2272(a) likewise required Labor to determine whether "a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated "

<u>Former Employees of Pittsburgh Logistics Sys., Inc. v. United States Sec'y of Labor</u>, 27 CIT __, Slip Op. 03-111 at 14 (Aug. 28, 2003) (**App. 4**) (hereinafter "<u>Final PLS Opinion</u>")   Tellingly, in requesting the second remand concerning the Former Employees' claims in this case, Labor acknowledged that it "intend{ed} to supplement the administrative record with additional evidence regarding the relationship between the Tulsa Accounting Center and British Petroleum ("BP/AMOCO") " (**S.P.R. 156-157**)   Unfortunately, Labor never fully evaluated the issue of control and ignored record evidence concerning the matter

After the Court's second remand order, counsel for the Former Employees had several telephone conversations with Labor's investigator and submitted written correspondence outlining (and attaching documentary evidence supporting) the claims of the Former Employees At the heart of these discussions and filings was the recognition that the outsourced Former Employees, even though they might have received their paychecks from IBM, remained under the control of BP (a producer of oil and natural gas) for purposes of TAA certification   (**S.C.R. 16-27**) (submitting documentation evidencing the existence of the SLA between BP and IBM that governed the activities of the Former Employees), (**S.C.R. 2-117, S.P.R. 118-197**) (explicitly setting forth the Former Employees arguments about control and attaching affidavits and additional documentary evidence concerning control)

The key issue in this appeal is whether the Former Employees were controlled by BP for purposes of TAA certification   It does not matter whether IBM and BP were affiliated -- in fact, as the Former Employees stated in their July 6, 2004 submission to Labor, "the Department appeared to have inadvertently based its {<u>First Negative Remand Determination</u>} on corporate ownership of the subdivision working in Tulsa, Oklahoma instead of determining whether there was sufficient 'control,' as required under the statute." (**S.C.R. 7; S.P.R. 123**)

**Business Confidential Information Deleted**

In the <u>Second Negative Remand Determination</u>, however, Labor summarily disposed of the key issue of whether BP controlled the Former Employees in one paragraph, again resting its determination on corporate affiliations·

> The information obtained during the remand investigation revealed that the relationship between IBM and BP is based on a contractual agreement documenting the commercial terms of service between two independent companies and that BP had no legal control over IBM employees  According to an IBM official, IBM is an independent company with its headquarters in Armonk, New York and <u>there is no affiliation</u> between IBM and BP  The IBM employees in Tulsa, Oklahoma provide finance, accounting and information technology services to multiple clients, including BP  These functions include general accounting, capital asset accounting, oil and gas revenue accounting, and accounts payable and receivable.  Further, according to the IBM official, workers of IBM were not employed at any BP facility during the relevant time period  Therefore, the Department determines that IBM workers were not under the control of BP during the relevant time period

**(S.P.R. 265)** (emphasis added)  In reaching this conclusion, Labor failed to even mention the evidence provided by the Former Employees  Labor did not distinguish or explain the contradictory declarations made under the penalty of perjury by the Former Employees  Instead, Labor's conclusion appears to consist of nothing more than assumptions based on isolated statements made by IBM officials

Importantly, the SLA establishing the contractual relationship between BP and IBM is not on the record  Even though Labor assumes that the SLA does not give BP control over the Former Employees, <u>nothing</u> on the record supports this assumption  To the contrary, everything on the record about the SLA leads to the opposite conclusion

- [      ] acknowledges that [

                                                                      ]  **(S.C.R. 200)**


- [      ] further acknowledges that [

Business Confidential
Information Deleted

]

**(S.C.R. 256)**

- While [     ] does state the Former Employees [
  ], **(S.C.R. 199)**, this is
  not at all inconsistent with the concept that BP managed and controlled the work that
  was performed by the Former Employees  The sworn statement of Brenda Betts
  clarifies

> 9         . . . I was told by BP, PwC, and IBM management that a Service Level
> Agreement ("SLA") between BP and PwC/IBM governed my responsibilities
> The SLA was referenced in memoranda and handouts discussing our job
> requirements and goals, such as those provided in Attachments 1 and 2
> Employee performance review standards were based upon the performance goals
> set forth in the SLA

> 10        In my daily professional capacity at the Tulsa facility, I received
> instructions from BP managers--both directly and through IBM managers--about
> the resolution of issues concerning BP accounts and instructions for dealing with
> BP client or customer contacts  I also was directed to "code" all of my time to
> BP project numbers, so that BP could track my activities  In addition, for all
> correspondence with BP customers by e-mail, fax, or telephone, I was directed
> to say or write "This is Brenda Betts from IBM, doing business for BP "

> 11        As a result of the SLA and the day-to-day direction that employees of the
> Tulsa facility received from BP managers, I understood that BP was
> contractually and operationally in control of the work performed at the Tulsa
> facility  Through its exercise of restraint and direction over production-related
> activities performed at the Tulsa facility, BP maintained the power to manage
> and direct the daily activities of the Former Employees  For example,
> employees of the Tulsa facility needed the approval of BP management before
> incurring any new costs or undertaking any project

Declaration of Brenda Betts **(S.P.R. 140; S.C.R. 36)**   <u>Accord</u>, Declaration of Julia Mouser

**(S.P.R. 146-147; S.C.R. 53-54).**[8]

---

[8] The Declaration of Julia Mouser additionally states at paragraph 12 that

> 12.       As an additional example of BP's control over and daily
> involvement with the outsourced Former Employees, the Former
> Employees were required to assist BP in litigation regarding wells
> owned and operated by BP  As part of this assistance, the Former

**Business Confidential Information Deleted**

Thus, the only record evidence about the SLA demonstrates that its terms accorded BP control over the Former Employees.  When Labor did ask [                    ] responded.

[


                                                              ]

[                                    ]  **(S.C.R. 200)**  By [

                                                              ]  Moreover, as discussed above, it cannot be forgotten that Labor is armed with subpoena power so that it can marshal all relevant facts   See 29 C F R  §§ 90.12 and 90 14.  If Labor determines it unnecessary to require that a clearly pertinent piece of evidence be placed on the record, then in light of its obligation to "conduct {its} investigation with the utmost regard for the interests of the petitioning workers," Abbott, 7 CIT at 328, 588 F  Supp  at 1442, any uncertainty about that evidence should be resolved in favor of the Former Employees

Labor attempts to justify its characterization of the SLA as merely a contract governing the commercial relationship between two unaffiliated companies by stating that more than one of IBM's clients was serviced by IBM out of the Tulsa facility   **(S.C.R. 265)**.  Labor provides no further discussion of this fact, as if to imply that BP was a standard, ordinary customer that would not have the influence or business interest to manage and control the operations of the Former Employees   The record evidence, however, demonstrates that [

                                                              ]   See [

_____

Employees had access to confidential information and aided in the development of work product for use in litigation by BP's counsel

**(S.P.R. 147; S.C.R. 54)**

**Business Confidential Information Deleted**

] (**S.C.R. 256**)   The record also demonstrates that the Former Employees were outsourced BP employees and that BP intended for these employees to continue working for the furtherance of BP's production activities   Sworn statements from Ms  Betts and Ms. Mouser both clarified that "one hundred percent of {their} time was devoted to work for BP" and that they "understood from the course of {their} day-to-day activities at the Tulsa facility and discussions with managers and other employees that at the time of {their terminations} the Tulsa facility retained its pre-existing role of providing functions essential to BP's U S  oil and gas production, exploration, and drilling operations " (**S.P.R. 138 & 144; S.C.R. 34 & 51**)

## 2.    The Former Employees worked at a shared facility with co-located BP workers

In its summary, one-paragraph conclusion on control, Labor also states that "according to the IBM official, workers of IBM were not employed at any BP facility during the relevant time period " (**S.P.R. 265**).  This statement appears to be an over-generalization of record evidence  In response to Labor's question whether, [

] [

] (**S.C.R. 256**)   The response, however, must be read in the context of all record evidence, which indicated that BP did maintain a presence and co-locate its employees at the Tulsa facility.  For example, the declaration of Brenda Betts states·

> 12     BP's control over daily involvement with the outsourced
> Former Employees are further evidenced by BP's maintenance of
> (1) a treasury on site at the Tulsa facility, (2) the mainframe
> computer at the Tulsa facility, and (3) other infrastructure.

(**S.P.R. 141; S.C.R. 37**).  Labor <u>never</u> asked [     ] whether any BP employees were co-located with the Former Employees at the Tulsa facility, and the only record evidence on this point is uncontested -- BP employees, in the form of treasury officials and other BP employees

responsible for computer and infrastructure matters, were co-located at the Tulsa facility [9]   These

BP employees, in their own right "could be certified for TAA," as demonstrated by the fact that

similarly situated BP/Amoco employees at the Tulsa facility were previously certified eligible to

receive TAA benefits as workers "engaged in activities related to exploration and production of

crude oil and natural gas." **(S.P.R. 266-267)** (discussing Case TA-W-35,309N)

      The fact that BP employees were co-located with the Former Employees at the Tulsa

facility is important because <u>Labor's Second Negative Remand Determination</u> opined on an

alternative theory of certification concerning leased workers

> Even assuming that the IBM workers were considered leased
> workers of BP, the IBM workers would not be eligible for TAA
> However, on January 23, 2004, a new policy was instituted which
> allowed a certification of all leased workers, including service
> workers who are working at the same location as workers who
> have previously been certified eligible for TAA   According to this
> policy, in order to be eligible, leased workers must perform their
> duties onsite at the affected location on established contractual
> basis   As discussed above, the IBM contract with BP does not
> subject the IBM workers to the kind of control that makes them
> leased workers   Further, it was determined that workers of IBM,
> Tulsa, Oklahoma are not co-located with BP workers at a BP
> facility that produces an article

**(S.P.R. 268)**   Thus, Labor again failed to fully investigate, asking only questions that allowed it

to draw the inferences it wanted to draw and refusing to delve into contrary evidence that

established that BP retained a direct presence in the Tulsa facility   Consequently, contrary to

Labor's conclusion, record evidence demonstrates that BP employees were co-located at a

facility that was shared with IBM.

      The Former Employees are not aware of any record evidence directly contradicting their

claims (1) that they were controlled by BP for purposes of TAA certification and (2) that they

---

[9]   Counsel understands from the Former Employees that had Labor asked, it would have
determined that twenty-four BP employees continue to work in the Tulsa facility

worked alongside BP employees performing essential tasks for the production of oil and gas
Labor failed to cite to record evidence upon which its assumptions to the contrary were based
Labor's Second Remand Negative Determination, therefore, was not based on a full and
complete investigation of the Former Employees' claims, as required by the statute

**B.    Labor Structured Its Investigation On Remand To Reach A Pre-Determined Outcome**

While the Former Employees recognize that Labor is charged with determining whether
petitioning workers satisfy the statutory standard for TAA certification, and that a TAA
investigation is conducted by the Agency, the law prohibits Labor from structuring its
investigation to reach a pre-determined outcome   Doing so is not effectuating the intended
purpose of the TAA provisions, which are by their nature remedial in purpose.  See Chevron, 26
CIT at __, 245 F  Supp  2d at 1318 (2002)

Labor's actions just prior to issuance of its Second Negative Remand Determination
demonstrate the pre-determined nature of its decision   Labor's investigator contacted counsel for
the Former Employees on July 26, 2004 to ask if the Former Employees would consent to a two-
week extension to the Court's August 2, 2004 deadline for Labor to file its results of the second
remand   Labor specifically requested the extension so that it could obtain information from BP
to help clarify information regarding this case   The Former Employees consented   On July 28,
2004, Labor's investigator contacted counsel for the Former Employees to request a three-week
extension (as opposed to a two-week extension), saying that the Department recognized it needed
additional time to gather the information it wanted from BP   Again, the Former Employees
consented.  The Former Employees, therefore, were surprised to receive by mail a copy of
Labor's Second Negative Remand Determination instead of a consent motion for extension of
time, the Former Employees were equally surprised not to find any additional record evidence

- 24 -

concerning discussions or evidence obtained by BP, which Labor acknowledged it needed to

obtain prior to completion of the investigation

The record demonstrates that Labor did not request an extension from the Court,

however, because Labor made a policy decision to deny the Former Employees TAA

certification  Two days after Labor requested the two week extension, and on the very same day

that Labor asked for an additional three weeks (instead of two), Labor sent the following [

]

[

]

(S.C.R. 257)  The questions that Labor asked [                    ] all appeared to relate to

the [                              ]  See id  Not only does the email indicate that Labor

was attempting to gather specific evidentiary responses to support a pre-determined outcome,

Labor did not corroborate or otherwise investigate the validity of the information it did obtain

from [    ] [10]  Three business days after sending this [                ], Labor filed its remand

determination with the Court in which it summarily determined that BP did not control the

Former Employees at the Tulsa facility  (S.P.R. 265)  The administrative record contains no

evidence obtained from BP after Labor informed counsel for the Former Employees that such

information was needed to complete the investigation  Rather, the timing of events and Labor's

[                    ] indicate that a pre-determined outcome supplanted any actual evaluation of

---

[10] Rather, as discussed above in Section II A, Labor appeared to draw unsupported
inferences from the information while ignoring other information contained in [

]

investigation findings in this case and that a decision was made to hurriedly gather information in order to support the pre-determined outcome

Counsel does not imply that it was entitled to participate in the decision-making process that is reserved to the agency, nor does Counsel represent that Labor is not entitled during the course of an investigation to refocus its attention on issues that are important to its decision. Labor, however, failed to act within the remedial spirit of the TAA statutory provisions when instead of conducting a full investigation for which it recognized more time was necessary, Labor opted to make a policy-driven decision that it then tried to quickly bolster through assumptions based on hastily gathered information

### C.   Labor's Lack Of Transparency Has Denied Plaintiffs The Opportunity To Meaningfully Participate In This Proceeding

"*Agency transparency* is a cornerstone of administrative law " <u>Slater Steels Corp v United States</u>, 27 CIT __, __, 279 F Supp 2d 1370, 1379 (2003) (emphasis in original) (antidumping proceeding)   Labor's repeated inconsistent articulation of the standards it used to determine eligibility for certification and its lack of public disclosure of the criteria it used in this instance to assess the Former Employees' claims were so non-transparent that Labor denied the Former Employees' an opportunity to meaningfully participate in this proceeding

In its <u>Initial Negative Determination</u>, Labor stated:

> Workers at the firm or subdivision may be certified only if their separation was caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to their firm by ownership, or a firm related by control   Additionally, the reduction in demand for services must originate at a production facility whose workers independently meet the statutory criteria for certification, and the reduction must directly relate to the product impacted by imports.

(**P.R. 23-24**).   Labor denied the Former Employees eligibility because "these conditions have not been met for workers at this facility " (**P.R. 24**)   In <u>Labor's First Negative Remand</u>

Determination, however, Labor stated that service workers would only be eligible for TAA if

they work in direct support of an affiliated facility currently certified for TAA, rather than one

"whose workers independently meet the statutory criteria for certification"

> Before service workers can be considered eligible for TAA, they
> must be in direct support of an affiliated facility currently certified
> for TAA or employed on a contractual basis at a location currently
> certified for TAA.

**(P.R. 56)**

Recognizing this inconsistency in Labor's policy, on April 23, 2004, the Court asked

Labor to clarify the standard it used to determine the eligibility of service workers for TAA

**(App. 9)**  On May 14, 2004, Labor filed a consent motion for voluntary remand so that it could

conduct a further investigation and make a redetermination concerning the Former Employees'

eligibility for TAA benefits  **(S.P.R. 152)**  Labor explained that it was requesting the remand, in

part, because Labor's March 31, 2004 denial of the Former Employees' Application for

Reconsideration "does not reflect Labor's current interpretation of the Trade Act regarding

eligibility of service workers for TAA benefits "  **(S.P.R. 155-56)**  Labor stated·

> As of April 2004, Labor will certify petitions from workers who
> perform services for a firm or an appropriate subdivision of such
> firm if the work of the petitioning workers is related to the firm's
> production of a "trade-impacted" article under 19 U S C  § 2272
> and the workers otherwise satisfy Trade Act eligibility criteria

**(S.P.R. 156)**

During the second remand proceeding, the Former Employees submitted evidence

demonstrating that they satisfied each of the criteria that Labor articulated in its latest standard

**(S.C.R. 2-117; S.P.R. 118-197)**  In Labor's Second Negative Remand Determination, Labor

again denied the Former Employee's TAA certification based on a finding that the Former

- 27 -

Employees were not engaged in the production of a trade-impacted article because "IBM workers were not under the control of BP during the relevant time period." (**S.P.R. 265**)

Although unclear, it appears that Labor's finding that IBM workers were not under the control of BP was made pursuant to a policy espoused by Labor in a [

] The [                ], however is an [


] (**S.C.R. 261**)  Importantly, this [


] (**S.C.R. 261**)  Because the [                ] are deemed confidential by Labor, and thus, subject to the Judicial Protective Order in this proceeding, counsel cannot even articulate (or rather speculate) to the Former Employees which [                ] they allegedly failed to satisfy Such action by Labor certainly does not satisfy Labor's obligation to conduct its investigation with the utmost regard for the interests of the petitioning workers.

Consequently, Labor's inconsistent articulation of the certification standards applicable to the Former Employees and its confidential treatment of the standard it ultimately appears to have applied in this case created a non-transparent process that denied meaningful participation by the very people the Trade Adjustment Assistance Act was enacted to benefit.

### III.  LABOR'S NEGATIVE DETERMINATION REGARDING ELIGIBILITY OF THE FORMER EMPLOYEES TO RECEIVE TAA CERTIFICATION IS NEITHER SUPPORTED BY SUBSTANTIAL EVIDENCE NOR IN ACCORDANCE WITH LAW

In reviewing Labor's negative determination, the Court must consider the totality of the evidence on the administrative record as a whole, including that which fairly detracts from the agency's decision  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464 (1951)  As discussed above, Labor's Second Negative Remand Determination is neither

supported by substantial evidence nor in accordance with law   Rather, Labor cobbled together

unsupported assumptions in an attempt to justify a pre-determined outcome   Actual record

evidence (some of which Labor ignored and some of which Labor refused to interpret through

the statutorily required lens of an agency interpreting a remedial statute) demonstrates that the

Former Employees, under the statute, must be certified as eligible to receive TAA benefits

      In requesting that the Court permit a second remand, Labor recognized that "its March

31, 2004 decision {did} not reflect Labor's current interpretation of the Trade Act regarding

eligibility of workers not directly engaged in the production of an article, historically referred to

as 'service workers '" Consent Motion for Voluntary Remand, at 4-5 (May 14, 2004)   In so

stating, Labor set forth the roadmap that it would apply during its investigation on remand

> Labor will investigate the relationship between the petitioners and
> BP/AMOCO   If there is insufficient evidence of a relationship that
> will support certification, Labor will conclude its investigation and
> reaffirm the initial denial of benefits   If there is sufficient
> affiliation, Labor will then investigate BP/AMOCO's operations to
> determine if the IBM workers are providing support for production
> of a trade-impacted article   If so, Labor will investigate whether
> the other applicable eligibility criteria for TAA certification have
> been met

Id. at 6   Thus, Labor outlined a three-pronged approach to determining whether the Former

Employees were entitled to TAA certification   First, Labor would determine whether there was

sufficient evidence of a relationship between Petitioners and BP   Second, Labor would

investigate BP/Amoco's operations to determine if the Former Employees provided support for a

trade-impacted article   Third, Labor would investigate whether the other criteria established by

19 U S C  § 2272(a) had been met   As set forth below, the administrative record indisputably

demonstrates that all three of Labor's criteria required for certification have been satisfied

- 29 -

### A.  BP Controlled The Former Employees

As recognized by this Court, the key determinant for whether there is a sufficient relationship between BP and IBM is not whether there was corporate ownership of IBM by BP, but instead whether BP exerted control over the Former Employees   See Final PLS Opinion, Slip Op  03-111, at 14 (**App. 4**)   The declarations of Madams Mouser and Betts (**S.P.R. 137-148**; **S.C.R. 33-64**), as well as the SLA executed by BP dictating the scope of the work performed by the Former Employees (evidence of the existence of which is at **S.C.R. 15-31**), clearly demonstrate that BP retained control over its outsourced employees at the Tulsa facility  In its reconsideration on remand, Labor, however, erred in concluding that the Former Employees were not under the control of BP

The appropriate basis for determining whether BP controlled the Former Employees turns on "who 'exercised actual control' over and who 'managed and directed'" the Former Employees   Final PLS Opinion, Slip Op  03-111 at 16 (**App. 4**) [11]   The administrative record, as developed during the second remand, clearly demonstrates that BP, a producer of oil and natural gas, retained actual control over the work of the Former Employees and managed and directed their on-the-job activities   Specifically,

---

[11] Prior to remand in the PLS case, the Court recognized:

> "Control" is not synonymous with "ownership."  It is the power to manage or direct       Congress was more concerned with remedying job losses as the result of import competition than with piercing corporate veils.  See 19 U S C  § 2102(4) (the "purposes of this chapter" include, inter alia, assistance to "industries, firm, {sic} workers, and communities to adjust to changes in international trade flows")

Initial PLS Opinion, Slip Op  03-21 at 25 (**App. 3**)

**Business Confidential**
**Information Deleted**

- BP executed a Service Level Agreement that dictated the scope of the work to be performed by the Former Employees   (**S.P.R. 140**) (Betts' Declaration ¶ 9), (**S.P.R.146**) (Mouser's Declaration ¶ 9)

- The Former Employees' performance reviews were based on employment standards established by BP.  See id  at (**S.P.R. 140**) 140 (Betts' Declaration ¶ 9), (**S.P.R. 140**) 146 (Mouser's Declaration ¶ 9)

- The Former Employees were dedicated to BP's needs, and the daily activities of the Former Employees were directed by BP managers.  (**S.P.R. 138, 140**) (Betts' Declaration ¶¶ 3, 10, and 11), (**S.P.R. 144, 146-47**) (Mouser's Declaration ¶¶ 3, 10, 11, and 12)

- The Former Employees needed the approval of BP management before incurring any new costs or undertaking any project   While this approval may have been routed through IBM, BP made the final determination about whether to perform the work (**S.P.R. 140**) (Betts' Declaration ¶ 11), (**S.P.R. 146-47**) (Mouser's Declaration ¶ 11)

- The Former Employees were active participants in litigation involving the wells owned and operated by BP, having access to confidential information and aiding in the development of work product for BP's counsel   (**S.P.R. 147**) (Mouser's Declaration ¶ 12)

- The Former Employees were instructed to hold themselves out to the world as representatives of BP.  Specifically, for all correspondence with BP customers by email, facsimile, or telephone, the Former Employees were directed to identify themselves as "doing business for BP "  (**S.P.R. 140**) (Betts' Declaration ¶ 10), (**S.P.R. 146**) (Mouser's Declaration ¶ 10)

- The Tulsa facility at which the Former Employees worked housed a BP treasury Moreover, BP retained control over the mainframe computer and other infrastructure on-site  (**S.P.R. 141**) (Betts' Declaration ¶12)

- The Former Employees were directed to code all of the time spent on work activities to BP project numbers so that BP could track the work they performed throughout the day.  (**S.P.R. 140**) (Betts' Declaration ¶10), (**S.P.R. 146**) (Mouser's Declaration ¶10)

Thus, Labor's Second Negative Remand Determination was legally insufficient   Labor refused to determine whether the Former Employees were controlled by BP for purposes of TAA certification, and in so doing it completely disregarded record evidence (including the affidavits filed by Madams Betts and Mouser and evidence concerning the BP-executed SLA)   Instead, Labor appears to have relied solely on information provided by [                    ]

Tellingly, Labor points to no evidence contradicting the evidence that employee performance reviews were based on BP standards, BP management approved new costs and the performance of new work, the Former Employees were directed to represent themselves as "doing business for BP," and the Former Employees kept track of their work using a BP tracking system.  Upon reviewing all relevant record evidence, it is clear that BP controlled the Former Employees

**B.     The Former Employees Supported the Production Of Crude Oil And Natural Gas**

The Former Employees were engaged in activities related to exploration and production of crude oil and natural gas   As discussed in the Former Employee's July 6, 2004 submission regarding Labor's second remand determination, Labor itself explained that "it has already determined that workers from the Tulsa facility who performed the same jobs as the Former Employees supported the production of a trade impacted article " **(S.C.R. 125)**   Specifically, Labor's 1999 certification (TA-W-36,309N) of workers at the Tulsa facility was premised on the fact that

> {t}he same workers have been providing the same accounting
> services at the same Tulsa location for a number of years
> However, the identity of their employer has changed twice over the
> pertinent period   Thus, the Department's records indicate workers,
> including accountants then working at the Tulsa facility      were
> certified eligible

**(S.C.R. 125-126)** (quoting Labor's First Negative Remand Determination, at 3)   Labor's previous determination that workers performing the same tasks (alongside the Former Employees at the same location) were engaged in activities related to the exploration and production of crude oil and natural gas remains applicable in demonstrating that the Former Employees were production workers

In its second negative remand determination, however, Labor mischaracterized the argument submitted by the Former Employees regarding their involvement in the production of

crude oil and natural gas   Specifically, Labor stated that the Former Employees assert the

"Workers of IBM, Tulsa, Oklahoma are engaged in production of a <u>trade impacted article</u> (crude

oil and natural gas), <u>based on a previous certification issued in February 1999 by the Department</u>

<u>for workers of Amoco Exploration and Production in the State of Oklahoma</u>" **(S.C.R. 264)**

(emphasis added)   The Former Employees never contended that the 1999 certification in and of

itself indicated that oil and natural gas produced during 2002 and 2003 automatically qualified as

a trade impacted article.  Instead, the Former Employees relied on the 1999 certification of the

Tulsa facility to demonstrate that the jobs performed by the Former Employees, which were the

same jobs Labor acknowledged were part of the 1999 certification, were necessary for the

production of oil and natural gas.  Tellingly, Labor never evaluated the voluminous factual

information submitted by the Former Employees which demonstrated that BP's domestic

production of crude oil and natural gas during 2002 and 2003 was adversely impacted by

imports.

As the Former Employees' stated in their submission,

> . the Former Employees continue to be controlled by BP   Their
> work in the Tulsa facility for BP never changed   This means that
> the Department's determination in 1999 that employees working
> out of Tulsa facility were 'engaged in activities related to
> exploration and production of crude oil and natural gas' (<u>i e</u>, they
> were production workers) is just as applicable today as it was then

**(S.C.R. 126)**   Labor, instead of focusing on whether control existed, simply went on to

determine that IBM does not produce oil and natural gas.[12] a fact that was never contested by the

---

[12] To justify its analysis concerning production of a trade impacted article, Labor
concluded that IBM does not produce crude oil and natural gas

Plaintiffs allege that members of the subject worker group are engaged in production
(crude oil and natural gas)   To address this allegation, the Department contacted the
subject company and requested that IBM verify this information   On further
investigation, it was revealed that no oil or gas is being produced within the IBM

Former Employees. Yet again, Labor stretched to put together a justification for its pre-determined outcome by refusing to evaluate record evidence, which clearly showed (and which Labor's prior determination acknowledged) that the jobs performed by the Former Employees supported the production of crude oil and natural gas, which (as shown by the evidence discussed below with regard to 19 U S C § 2272(a)(2)) were trade-impacted merchandise

## C.      The Former Employees Meet The Requirements of 19 U.S.C. § 2272(a)

The statute requires certification where, first, a controlled subdivision of BP became totally or partially separated (§2272(a)(1)) and, second, there was either an absolute decrease in BP's production (§2272(a)(2)(A)), or BP shifted its production overseas (§2272(a)(2)(B)) [13] Accord 29 C F R § 90 16(b). Labor refused to analyze or discuss whether the Former Employees satisfied the requirements of 19 U S C § 2272(a)  The Former Employees, however, clearly have met the statutory prerequisites

### 1.      A Controlled Subdivision of BP Has Become Totally Or Partially Separated (§2272(a)(1))

Under 19 U S C §2272(a)(1), a controlled subdivision of BP "ha{s} become totally or partially separated " Because the Former Employees are controlled by BP and are totally separated from the Tulsa facility, this criterion is satisfied

### 2.      There Has Been An Absolute Decrease In BP's U.S. Production (§2272(a)(2)(A))

According to 19 U S C § 2272(a)(2)(A), certification of separated workers is required where import competition causes an absolute decrease in sales or production  As the Former

Corporation and workers of the subject firm are not in support of the production for any IBM affiliated facilities

**(S.P.R. 265-66)**

[13] In this case, both prongs of the disjunctive are satisfied

Business Confidential
Information Deleted

Employees made abundantly clear in their July 6, 2004 submission, based on BP's publicly filed securities documents, the company's U.S production of oil and natural gas decreased absolutely prior to the displacement of the Former Employees  (**S.C..R. 9-13; S.P.R. 126-129**)  BP's production of oil in the continental U.S  decreased by 27 percent over the past four years, while natural gas production decreased by 11 percent over the same period  (**S.C.R. 11; S.P.R. 127**) (exhibits cited in submission).   BP's decrease in production occurred while imports of oil and natural gas were increasing [14]  In 2003, the year the Former Employees were displaced, the U S imported 63 percent of its oil, its highest ever proportion of imports from foreign sources. (**S.C.R. 12; S.P.R. 128**) (exhibits cited in submission)   Likewise, U S  natural gas imports increased during 2002-2003 and are projected to increase during 2003-2004  (**S.C.R. 12; S.P.R. 128**) (exhibits cited in submission)   The evidence of BP's decreased production in the face of increasing imports was further supplemented at Labor's request  See Letter from King & Spalding to Ms  Chen (July 28, 2004) (attaching bullet points and 39 pages of supporting documentation concerning BP's decrease in U S  production of oil and natural gas and BP's shift of production overseas) (**S.P.R. 204-255**)

   In the Second Negative Remand Determination, as noted above, Labor never analyzed whether there was a decrease in BP's production of oil and gas   Only in one conclusory statement, summarizing a [

_____

   [14] Under the statute, these imports, by definition, are directly competitive with BP's production

> Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas, shall be considered to be producing articles competitive with imports of oil and with imports of natural gas

19 U S.C. §2272(c)(2)(B)

], does it appear that Labor even inquired into the matter when it wrote that [

] (S.C.R.

203) These [       ] words, however, are not quoted nor are they verified by any submission

from [    ]  Labor cannot "rely on the unverified statements of company officials in the face of

factual discrepancies in the record " Former Employees of Ameriphone, Inc. v United States, 27

CIT __, __, 288 F. Supp  2d 1353, 1359 (2003)  If Labor relied on this statement, it never said

so and it failed to explain the directly contradictory evidence contained in BP's filings with the

Securities and Exchange Commission and the company's annual reports  The record evidence

overwhelmingly demonstrates that imports caused BP to decrease its domestic production of oil

and natural gas

      The increased imports of oil and natural gas contributed importantly to the decreased

U S  production and, in turn, the separation of the Former Employees [15]  Thus, the Former

Employees are entitled by law to be certified as eligible to receive TAA benefits as a result of the

impact caused by BP's absolute decrease in domestic production of oil and natural gas

### 3.    There Has Been A Shift In BP Production From The United States To Other Countries (§2272(a)(2)(B))

      Moreover, regardless of whether BP decreased production, certification must be granted

to the Former Employees under 19 U S C  § 2272(a)(2)(B), which provides that separated

workers are entitled to TAA benefits when the producing company that controls their jobs shifts

---

[15] Declarations by Ms  Betts and Ms  Mouser make clear that overseas cost savings place significant pressure on U S  producers  (S.P.R. 141) (Betts' Declaration ¶ 13), (S.P.R. 147) (Mouser's Declaration ¶ 13)  Consultations between BP and IBM led to the decision that additional cost saving measures should be taken with regard to the functions being performed at the Tulsa facility, and, in turn, the Former Employees were discharged

Business Confidential
Information Deleted

production outside the United States [16]  Once again, on this point Labor refused to analyze the shift in BP's production from the United States to other countries

The record evidence, however, is undisputed   At the same time BP was facing import competition in the United States, it was shifting production overseas to countries that included Algeria, Angola, Azerbaijan, and Russia  (**S.C.R. 13; S.P.R. 129**) (exhibits cited in submission)  Labor even recognized that [                                                    ]  (**S.C.R. 203**)  BP's production in Russia is now the third largest of integrated oil companies in Russia and is comparable in size to Amoco prior to its merger with BP  (**S.C.R. 14; S.P.R. 130**) (exhibits cited in submission).  As BP's production was decreasing in the United States during 2002-2003, production increased in Europe, Eurasia, the Middle East, and Africa  (**S.P.R. 206**) (exhibits cited in submission)  <u>See also</u> Letter from King and Spalding to the Department of Labor regarding BP's Decrease in U.S  Production of Oil and Natural Gas and BP's Shift of Production Overseas (July 28, 2004) (**S.P.R. 204**)

This shift in production, coupled with the clear increase in directly competitive oil and natural gas imports, satisfies the statutory requirements for certification under 19 U S C. §

---

[16] Specifically the statute provides for certification of separated workers when.

    (i) there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision, and

    (ii)     there has been or is likely to be an increase in imports of articles that are like or directly competitive with article which are or were produced by such firm or subdivision

19 U S.C  §2272(a)(2)(B)

2272(a)(2)(B)   Certification for TAA eligibility, therefore, must be granted under the statutory

standard set out in 19 U S.C  § 2272(a)

## IV.    LABOR'S DISREGARD FOR ITS STATUTORY OBLIGATIONS AND ITS REPEATED REFUSAL TO CONDUCT A FULL INVESTIGATION REQUIRE REVERSAL

Labor had a statutory duty to make an informed decision, supported by substantial

evidence, after marshalling all the relevant facts that could be obtained in a comprehensive

investigation  This was to be done "with the utmost regard for the interests of the petitioning

workers " Stidham, 11 CIT at 551, 669 F  Supp  at 435   Instead, Labor ignored record evidence

proffered by the Former Employees, reached a pre-determined outcome, and failed to make its

decisions in a transparent manner

Moreover, the request by Labor's investigator for a three-week extension to conduct a

more thorough investigation indicates that Labor recognized additional factual information from

BP might have benefited the Former Employees, yet this information was never placed on the

record  Labor acted with unclean hands   It reached a determination that is not supported by

substantial evidence, refused to locate evidence that it acknowledged was essential to its

investigation, and disregarded the three week extension agreed to by the Former Employees to

complete the investigation [17]  It would be inequitable to simply remand this matter again at the

end of 2004 so that Labor can pick-up an investigation that it should have completed in August

It cannot be forgotten that unnecessary administrative delays have a real-life impact on former

employees who are deserving of trade adjustment assistance benefits·

---

[17] Labor's failure to conduct an adequate investigation in this case is not an isolated problem.  As the Court has noted, "the Labor Department may be routinely failing to 'conduct {its} investigation with the utmost regard for the interests of the petitioning workers '" Former Employees of Ameriphone, 288 F  Supp  2d at 1359, (citing Stidham, 11 CIT at 551, 669 F  Supp  at 435).  Accord, Final PLS Opinion, Slip Op  03-111 (App. 4)

> There is a very human face on these cases  Workers who are
> entitled to trade adjustment assistance benefits but fail to receive
> them may lose months, or even years, of their lives  And the
> devastating personal toll of unemployment is well-documented
> Anxiety and depression may set in, with the loss of self-esteem,
> and the stress and strain of financial pressures.  Some may seek
> refuge in drugs or alcohol, and domestic violence is, unfortunately,
> all too common

Former Employees of Chevron Prods  Co  v  United States Sec'y  of Labor, 27 CIT __, __, 298

F  Supp  2d 1338, 1349 (2003)  (citations omitted)

Consequently, reversal--as opposed to remand--is now appropriate  See 19 U S.C  §

2395(c) ("{The}  Court of International Trade shall have jurisdiction to affirm the action of the

Secretary of Labor     or to set such action aside, in whole or in part "); Former Employees of

Hawkins Oil and Gas, Inc  v  United States Sec'y of Labor, 17 CIT 126, 130, 814 F Supp  1111,

1115 (1993) (Court certified the petitioners as eligible for TAA benefits after acknowledging that

Labor repeatedly ignored instructions to conduct a more thorough investigation and that ordering

yet another remand would be futile), United Elec , Radio, and Mach  Workers of America v

Martin, 15 CIT 299, 309 (1991) (Court ordered petitioners be certified for TAA eligibility after

expressing frustration with Labor's repeated failure to conduct an adequate investigation)

Accord Ammex, Inc  v  United States, Slip Op  04-89, 2004 WL 1630514, at *5 n  12 (Ct  Int'l

Trade July 20, 2004) (citing PPG Indus  Inv  v  United States, 11 CIT 303, 309, 660 F  Supp

965, 970 (1987)) (in applying the arbitrary and capricious standard, the Court granted the

plaintiff's motion for judgment and refused to remand after finding error, recognizing that "the

court need not remand if the remand would be 'futile' by virtue of having no effect on the result

of the case")

The Court's determination in Pittsburgh Logistics Systems is strikingly appropriate in

this instance  In the Final PLS Opinion, the Court determined that reversal was required where

Labor failed on remand to point to substantial record evidence showing that the outsourced

plaintiffs did not produce an article and that the outsourced plaintiffs did not remain under the

control of the company from which they had been outsourced  Final PLS Opinion, Slip  Op  03-

111 at 26 (**App. 4**)

Labor has had three bites at the apple (including two remands) in this instance to conduct

an adequate investigation and to evaluate the facts under an appropriate legal analysis, which it

clearly has not done  As described above, the administrative record provides substantial

evidence that the Former Employees should have received TAA benefits  Instead, Labor was

intent on reaching a pre-determined outcome  Labor refused to apply the legal standard set out

in its own request for a second remand, affirmatively ignored existing record evidence, and

refused to conduct a thorough investigation  Thus, the Court should award TAA certification to

the Former Employees, who have been wrongfully denied benefits.

## CONCLUSION

For the foregoing reasons, the Former Employees respectfully request that the Court

reverse Labor's Second Negative Remand Determination and issue instructions that Labor

certify the Former Employees as eligible to receive trade adjustment assistance benefits

Respectfully submitted,

J  Michael Taylor
Christine E  Savage
Douglas S  Ierley
Stephen A  Jones

KING & SPALDING LLP
Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served a copy of the non-confidential version of Plaintiff's Rule 56 1 Brief And Comments Concerning The August 2, 2004 Negative Determination On Reconsideration On Remand upon opposing counsel by hand delivery to the following

        MICHAEL D  PANZERA
        Attorney
        Department of Justice
        Civil Division
        Commercial Litigation Branch
        1100 L Street, N W
        Washington, D C  20530

This 22nd day of September, 2004

                                            _____
                                    S/ Michael Taylor

RECEIVED & FILED

2004 SEP 24  P 12 39

IN ACCORDANCE WITH THE PROVISION
OF RULE 5(e)  THIS PAPER IS DEEMED
FILED AS OF THE DATE OF MAILING-
TO WIT  9/22/04

Copy To: Judge Ridgway